Cynthia A. METZLER, Acting Secretary of Labor, United States Department of Labor (substituted as Plaintiff for Robert B. Reich, resigned), Plaintiff,

v.

LYKES PASCO, INC., Defendant.

No. 95–14330–CIV–DAVIS.

United States District Court,
S.D. Florida,
Fort Pierce Division.

April 14, 1997.

Rafael Batine, Office of the Solicitor, U.S. Dept. of Labor, Atlanta, GA, for Plaintiff.

William J. Rogers, Collier, Shannon, Rill & Scott, Washington, DC, John W. Campbell, Michael D. Malfitano, Malfitano & Campbell, P.A., Tampa, FL, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

EDWARD B. DAVIS, Chief Judge.

The Secretary of Labor brought this action on December 6, 1995, pursuant to her authority to enforce the Migrant and Seasonal Agricultural Worker Protection Act (AWPA), 29 U.S.C. § 1801 et seq. The Secretary alleges that Lykes Pasco violated the AWPA by causing migrant and seasonal workers to be transported to its citrus groves in vehicles that did not conform to federal and state safety standards, and by failing to ensure that its farm labor contractors had valid certificates of registration with the Department of Labor. The Secretary seeks to permanently enjoin Lykes Pasco from repeating the alleged AWPA violations. Lykes Pasco filed its amended answer on February 5, 1996, denying the Secretary's claims. The Court conducted a non-jury trial of this matter on March 7, 1997. Based on the evidence adduced at trial and the entire record, and pursuant to Federal Rule of Civil Procedure 52(a), the Court enters the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. Lykes Pasco is a grower, harvester and processor of citrus fruit. The company owns and operates citrus groves in eighteen Florida counties.

2. Lykes Pasco employs between 700 and 1,300 workers at its processing operation, depending on the season. The company's largest grove is the Bassinger Grove, which contains about 13,000 acres of cultivated land and 25,000 total acres.

3. The citrus industry is very labor-intensive, and generally involves hiring fruit pickers from outside Florida who require transportation to the state, temporary housing, and daily transportation to and from the groves.

4. Rather than employ workers to harvest its fruit, Lykes Pasco enters into agreements with independent contractors. The contractors are "farm labor contractors" within the meaning of the AWPA.

5. The agreements that Lykes Pasco signs with the contractors impose no specific requirements on how the contractors harvest the fruit, nor do the agreements direct the contractors to recruit, hire or transport migrant farm workers to the Lykes Pasco groves.

6. Nonetheless, the contractors hire hundreds of workers, many of them Mexican citizens, to harvest Lykes Pasco's fruit. Because the company's groves are located in

isolated areas of Florida that are far removed from public transportation, many of the workers are heavily dependent on the contractors for daily transportation to and from work. The Bassinger Grove, for example, is located twenty to thirty miles from the nearest public transportation.

7. Lykes Pasco does not transport workers to and from Florida at the beginning and end of the harvesting season, nor does it drive workers to and from its groves each day. Some workers use car pools, while the contractors drive others.

8. Before hiring a contractor, Lykes Pasco requires proof that the Department of Labor has certified the person to operate as a farm labor contractor. The contractor must provide a valid certificate of registration from the Department showing that he or she is registered to conduct the specific activities—e.g., harvesting citrus fruit or transporting workers—for which Lykes Pasco is hiring the person. Lykes Pasco retains a copy of this certificate. The contractor also must show that he or she is properly insured and covered by workers' compensation.

9. The Department also issues certificates authorizing some contractors to transport workers in specific vehicles. Lykes Pasco confirms that its contractors have valid federal certificates authorizing them to transport workers. Lykes Pasco also checks to make sure its contractors have valid drivers' licenses and proper insurance.

10. However, once Lykes Pasco hires a contractor, it does not check further to make sure that the person is transporting workers only in vehicles the Department has authorized.

11. Several years ago, Lykes Pasco began using a fleet of twenty-three buses in the Bassinger Grove to transport workers from just inside the main entrance to their daily harvesting sites. The buses also moved workers from one site to another during the day, and drove them back to the main gate at the end of the day. The buses were registered with the State of Florida. Although Lykes Pasco owned the buses, its employees did not drive them. Rather, independent contractors and *their* employees operated the buses.

12. Lykes Pasco operated the buses in February 1995, and continued to use them until December 1996. Then, near the time the company moved for summary judgment in this action, it ceased operating the buses and disposed of them. The company has not used buses or any other vehicles to transport workers in the Bassinger Grove since December 1996.

13. The Department of Labor investigated Lykes Pasco February 7 through February 26, 1995, to see if the company was complying with its obligations under the AWPA.

14. On the morning of February 7, 1995, Diane Reynolds, a farm labor specialist for the Department, and eight other investigators interviewed drivers and passengers in vehicles that dropped off workers in the Bassinger Grove parking lot. The investigators also inspected vehicles to see if they complied with federal safety standards.

15. The investigators inspected nine vehicles that morning. Three others had come and gone by the time they arrived. Only one of the nine vehicles had a valid Department certificate authorizing it to transport workers.

16. In addition, four of the vehicles did not meet federal safety standards. One had a large hole in the floor directly above the exhaust pipe. A second one did not have enough seats for the seventeen people riding in it. A third one had a crate, a metal chair and a bucket as seats, and other bench seats were unsecured. It also had no seat belts. The fourth had no seat belts, no inside door handle, and unsecured benches as seats.

17. The eight vehicles that were transporting workers without proper federal authorization also did not have required insurance and workers' compensation coverage. Additionally, none of the eight drivers had valid Department certificates authorizing them to transport workers.

18. All of the approximately 200 workers who arrived in the parking lot on February 7 rode in vans driven by contractors or their employees. None of the fruit pickers drove themselves to work.

19. Car pools generally consist of two to six workers in each vehicle. The vans transporting fruit pickers on February 7 had up to seventeen people each as passengers. There are fifty to sixty parking spaces in the Bassinger Grove parking lot, meaning on average four workers would have to ride in each car for there to be sufficient parking at the grove for all workers.

20. The Department investigation identified twenty-one people either transporting workers or otherwise working as farm labor contractors around the Bassinger Grove parking lot on February 7. Only nine of them were under contract with Lykes Pasco as farm labor contractors. In other words, twelve people not authorized to transport workers drove fruit pickers to work at Lykes Pasco groves.

21. A guard at the Bassinger Grove front gate monitors entrances and departures. The guard does not inspect vehicles that drop off workers in the parking lot to ensure that only authorized vehicles are transporting workers to Lykes Pasco groves.

22. Lykes Pasco once studied the cost of monitoring whether contractors are complying with the AWPA by transporting workers only in authorized vehicles. The study concluded that it would cost $160,000 to check contractor vehicles for compliance once a week. According to the study, the company would have to hire, train and pay three people, and outfit them with cars, radios and telephones.

23. However, it would "very possibly" cost less than $1,000 for the company to require all of its transportation-authorized contractors to place a certificate in their windshields showing what vehicle each contractor is authorized to transport workers in. Testimony of Cesar Martinez, Trial Trans. at 72.

24. As a result of its investigation, the Department filed a five-count complaint against Lykes Pasco on December 6, 1995, seeking injunctive relief and charging that the company violated the AWPA by

(a) failing to disclose to each migrant worker, in writing in a language common to each worker, the terms and conditions of employment;

(b) transporting workers in vehicles not conforming to federal safety regulations;

(c) failing to ensure that drivers the contractors used to transport workers had state licenses;

(d) failing to appropriately insure vehicles used to transport workers; and

(e) failing to take reasonable steps to ensure that contractors had valid certificates of registration.

## CONCLUSIONS OF LAW

### I. Introduction

1. This Court has jurisdiction pursuant to 29 U.S.C. § 1852, authorizing the Secretary to petition any United States District Court for injunctive relief if it determines that the AWPA has been violated.

2. The Secretary contends that Lykes Pasco is liable for the violations alleged in Counts (a) through (d) because it is an "agricultural employer" within the meaning of the AWPA, and is jointly responsible with its farm labor contractors for the violations.

3. The AWPA defines an agricultural employer as "any person who owns or operates a farm, ranch, processing establishment, cannery, gin, packing shed or nursery, or who produces or conditions seed, and who either recruits, solicits, hires, employs, furnishes, or transports any migrant or seasonal agricultural worker." 29 U.S.C. § 1802(2). *See also* 29 C.F.R. § 500.20(d).

4. The Secretary argues that Lykes Pasco is an agricultural employer because it transports workers within the meaning of the AWPA. The Act does not define the term "transport."

5. If Lykes Pasco is an agricultural employer that transports workers, it is responsible under the AWPA for ensuring that vehicles used to transport workers comply with federal safety and insurance requirements. *See* 29 U.S.C. § 1841, and 29 C.F.R. §§ 500.100 through 500.128. As detailed in the Court's Findings of Fact, several vehicles that the Department investigators examined did not comply with those safety and insurance standards.

6. The Department regulations spell out when an agricultural employer bears responsibility for compliance:

> Responsibility for compliance with the motor vehicle safety and insurance provisions of section 401 of the Act and §§ 500.100 through 500.128 of these regulations is imposed upon the person or persons using or causing to be used, any vehicle for transportation of migrant or seasonal agricultural workers. As stated in these regulations, the transportation safety provisions do not include certain car pooling arrangements. Additionally, these regulations do not impose responsibility on an agricultural employer or agricultural association for a farm labor contractor's failure to adhere to the safety provisions provided in these regulations when the farm labor contractor is providing the vehicles and directing their use. However, when an agricultural employer or agricultural association specifically directs or requests a farm labor contractor to use the contractor's vehicle to carry out a task for the agricultural employer or agricultural association, such direction constitutes causing the vehicle to be used and the agricultural employer or agricultural association is jointly responsible with the farm labor contractor for assuring that the vehicle meets the insurance, and safety and health provisions of these regulations.

29 C.F.R. § 500.70(c). The Secretary acknowledges that Lykes Pasco did not expressly direct or request its contractors to drive workers in their vehicles. However, the Secretary maintains that Lykes Pasco caused the contractors to transport the workers to, from, and between its groves.

7. Lykes Pasco denies that it caused workers to be transported, and therefore argues that it is not an agricultural employer. If that is true, then Lykes Pasco is entitled to judgment on Counts (a) through (d).

8. Count (e) is governed by a separate provision in Section 500.70(c) of the regulations:

> In all cases a person using a farm labor contractor is required to take reasonable steps to determine that the vehicle used by the farm labor contractor is authorized to be used for transportation as prescribed in section 402 of the Act and § 500.71 of these regulations.

29 C.F.R. § 500.70(c). Section 402 of the act (codified at 29 U.S.C. § 1842 and closely mirrored by the language of 29 C.F.R. § 500.71) provides that:

> No person shall utilize the services of any farm labor contractor to supply any migrant or seasonal agricultural worker unless the person first takes reasonable steps to determine that the farm labor contractor possesses a certificate of registration which is valid and which authorizes the activity for which the contractor is utilized. In making that determination, the person may rely upon either possession of a certificate of registration, or confirmation of such registration by the Department of Labor.

29 U.S.C. § 1842.

9. Under Section 1842, Lykes Pasco does not have to be an agricultural employer to incur liability. Any person who hires a farm labor contractor must take reasonable steps to ensure that the contractor has a valid certificate authorizing it to perform the specific jobs for which the contractor is being hired. *Ricketts v. Vann*, 32 F.3d 71, 74 n. 3 (4th Cir.1994). The issue in this case is whether Lykes Pasco took reasonable steps to ensure that its contractors were transporting workers only in authorized vehicles.

## II. Counts (a) Through (d)

10. The Secretary presented no evidence on any failure of Lykes Pasco to disclose the terms and conditions of employment to migrant workers in a language they could understand. Therefore, Lykes Pasco is entitled to judgment in its favor on Count (a).

11. The Secretary is pursuing liability in Counts (b) through (d) on two theories:

(A) Lykes Pasco caused workers to be transported to and from its groves by farm labor contractors; and

(B) Lykes Pasco was transporting workers within the meaning of the AWPA when it operated the Bassinger Grove buses.

12. As to the first argument, the Court noted in its summary judgment order that the Secretary had admitted during dis-

covery that it was not basing its prosecution on this theory:

6. Plaintiff relies upon a theory that Defendant is an agricultural employer because it causes migrant and seasonal workers to be transported to its operation.

Response: Denied.

Response Number Six to Defendant's First Request for Admissions. Under Federal Rule of Civil Procedure 36(b), "any matter admitted ... is conclusively established unless the court on motion permits withdrawal or amendment of the admission." An admission that is not withdrawn or amended cannot be rebutted by contrary testimony or ignored by a district court. *American Auto. Ass'n v. AAA Legal Clinic of Jefferson Crooke, P.C.*, 930 F.2d 1117, 1120 (5th Cir. 1991).

13. Having admitted that it was not pursuing a theory that Lykes Pasco caused farm labor contractors to transport workers to its groves, the Secretary was precluded from arguing this theory at trial. There was testimony concerning what constitutes "causing to be transported," but the Secretary never moved to withdraw or amend its admission. The Court cannot disregard the admission. Based on the Secretary's admission, the Court need not decide whether Lykes Pasco caused workers to be transported to and from its groves.

14. As to the second theory, there was very little evidence during trial on the Bassinger Grove buses. Diane Reynolds testified that she based her conclusion that Lykes Pasco was an agricultural employer in part on the company's use of the buses. Trial Trans. at 16–17. There was no testimony on the issue of whether Lykes Pasco is likely to resume using the buses. The closest reference was a colloquy between the Secretary's counsel and Reynolds:

Q: And now that they have gotten rid of the buses, ma'am, have you made a determination whether Lykes Pasco is an agricultural employer?

A: Yes.

Q: And what's your determination? What's it based on?

A: That they continue to be an agricultural employer based on the fact that we believe that this employer solicits workers through the harvesters that they used.[1]

Trial Trans. at 17. A controversy may be rendered moot when a defendant voluntarily ceases its offending conduct and there is no reasonable expectation that it will repeat the wrong. *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 897–98, 97 L.Ed. 1303 (1953). The likelihood of the defendant resuming its conduct is one factor for the Court to consider when weighing whether to grant an injunction. *Id.* In all cases, the moving party must satisfy the court that it needs an injunction by showing that there is more than a mere possibility that the wrong will reoccur. *Id.* There must be some cognizable danger. *Id.*

15. The Court, relying in part on *Secretary of Labor v. Burger King*, 955 F.2d 681 (11th Cir.1992), declined to render summary judgment in favor of Lykes Pasco on this issue because there appeared to be a factual question as to whether Lykes Pasco would resume using the buses. *Burger King* held that the mere promise of a defendant to stop its allegedly illegal activity was not sufficient to render a request for an injunction moot. *Id.* at 684. Lykes Pasco presented evidence that not only did it stop using the buses, but that it sold them. The Secretary presented no evidence showing that Lykes Pasco is either using any other vehicles to transport workers in the Bassinger Grove, or plans to reacquire the buses. While it is always possible that Lykes Pasco could buy new buses or transport workers in other vehicles, the government has not shown that this action is imminent or likely. The Court therefore, concludes that enjoining Lykes Pasco from using the buses to transport workers would amount to an advisory opinion. The issue is moot.

16. Based on its conclusions in Paragraphs Eleven through Fifteen, the Court renders judgment in favor of Lykes Pasco on Counts (b) through (d).

---

1. The Secretary formally abandoned its solicitation theory in its post-trial memorandum.

### III. Count (e)

17. The evidence shows that when Lykes Pasco hires farm labor contractors, it regularly asks them to produce valid certificates of registration showing that they are authorized to perform the activities for which they are being hired.

18. But the evidence also shows that farm labor contractors not authorized to transport workers are, in fact, driving workers to pick fruit at the Bassinger Grove, often in unsafe vehicles. Lykes Pasco argues that it bears no responsibility for this situation. The company maintains that taking the minimal action of viewing a valid certificate of registration is a reasonable step under Section 1842 of the AWPA. Therefore, Lykes Pasco argues that it is absolved of any responsibility under the AWPA for what happens after it hires contractors.

19. This argument, however, contravenes the purpose of the AWPA—to protect migrant workers. The AWPA is a remedial act which courts must broadly construe. *Antenor v. D & S Farms*, 88 F.3d 925, 933 (11th Cir.1996). "Broad construction of the Act comports with the Act's humanitarian purpose to protect all those hired by middlemen to toil in our nation's fields, vineyards and orchards." *Caro–Galvan v. Curtis Richardson, Inc.*, 981 F.2d 501, 505 (11th Cir. 1993) (quotation omitted).

20. Congress enacted many sections of the AWPA in 1982 to impose responsibility and liability specifically on growers such as Lykes Pasco. *Antenor*, 88 F.3d at 930. The Act's predecessor had focused on regulating crew leaders who regularly recruit and manage migrant workers. H.R. Rep. 885, 97th Cong., 2d Sess. 6 (1982), *reprinted in* 1982 U.S.C.C.A.N. 4547–48. However, that law had failed to "reverse the historical pattern of abuse of migrant and seasonal farm workers" because crew leaders were transient and insolvent. *Id.* at 4548–49. In drafting the AWPA, Congress took a completely new approach, making agricultural employers directly responsible for farm workers who, as a matter of economic reality, depended on those employers for their livelihood. *Antenor*, 88 F.3d at 930, citing H.R. Rep. 885, U.S.C.C.A.N. at 4553–54.

21. Although the language of Section 1842 allows agricultural employers to rely on contractors' valid certificates of registration, applying Lykes Pasco's interpretation of "reasonable steps" would render Section 1842 meaningless. The only duty imposed on an agricultural entity would be to look at a piece of paper. Once the grower had seen the contractor's certificate, the contractor would be free to drive fruit pickers in whatever broken down, unsafe, uninsured van he or she chose. The growers actually using the workers could turn a blind eye to such flagrant abuses. Congress surely did not pass a law to impose additional responsibilities on agricultural employers, then turn around and say that all they must do is examine a piece of paper.

22. In *Howard v. Malcolm*, 852 F.2d 101 (4th Cir.1988), a farm labor contractor showed an agricultural employer a valid certificate authorizing him to house workers at a specific location. However, the contractor housed workers at a different site. *Id.* at 105. The district court interpreted Section 1842 in the same manner that Lykes Pasco argues for in this case, only requiring the employer to examine the contractors' certificate. *Id.* The district court held that the employer was under no duty to verify the specific location. *Id.* The Circuit Court reversed, finding that Section 1842 required more than just examining certificates. *Id.* The employer had to take reasonable steps to verify that the contractor was housing workers at the location specified on the certificate:

> For § 1842 to be effective, growers who delegate responsibilities must verify that the labor contractor is authorized to house the workers at the safe, sanitary facility designated in the certificate. Mere verification that the contractor may arrange housing in general will serve as little, if any, protection for the crewmembers.

> Thus, this court finds that when § 1842 requires the grower or farm owner to take reasonable steps to ensure that the contractor is authorized to do the activity in question, he is required to reasonably verify the specific location.

23. In this case, merely verifying that a certificate authorizes a contractor to transport workers does little to protect the workers. For Section 1842 to be effective and accomplish its intended purpose, Lykes Pasco must take reasonable steps to ensure that the contractor is performing only the activity the certificate authorizes—transporting workers in a specific vehicle.

24. *Ricketts v. Vann*, 32 F.3d 71 (4th Cir.1994), which Lykes Pasco relies on, is not to the contrary. *Ricketts* found no violation of Section 1842 because "it does not impose an affirmative duty on a farmer to ensure that a migrant laborer *does not ever* ride in some other vehicle." *Id.* at 77 (emphasis added). This Court does not read *Ricketts* as broadly as Lykes Pasco does—that is, standing for the proposition that a grower never has to do anything beyond making sure that the certificate of registration is valid at the time that the grower hires the contractor. *Ricketts* says only that courts should not hold growers to the unreasonable standard of ensuring that a worker *never* rides in another vehicle. This is in harmony with *Howard*, which requires only reasonable steps to verify that contractors are doing what their certificates allow.

25. The certificates that the contractors showed Lykes Pasco managers authorized them to drive workers in specific vehicles. Lykes Pasco was not taking reasonable steps to ensure that the contractors were driving workers in those specific vehicles. More than half of the people who transported workers on February 7, 1995, were not authorized to do so. Eight of the nine vehicles inspected in the parking lot did not have proper federal certification. Half of the eight blatantly violated federal safety standards. None were insured.

26. To show that it is entitled to a permanent injunction, the Secretary must demonstrate (1) success on the merits of its claim; (2) that it will suffer irreparable harm in the absence of an injunction and has no adequate remedy at law; (3) the threatened injury to the plaintiff outweighs any injury the defendant will suffer if the Court grants an injunction; and (4) an injunction will not harm the public interest. *Plummer v. American Inst. of Certified Pub. Accountants*, 97 F.3d 220, 229 (7th Cir.1996); *Fogie v.*

*THORN Americas, Inc.*, 95 F.3d 645, 654 (8th Cir.1996).

27. Paragraphs Seventeen through Twenty–Five demonstrate that the Secretary has succeeded on the merits of its claim in Count (e).

28. An award of damages cannot adequately compensate the Secretary for the injuries that migrant and seasonal workers suffer by riding in unsafe vehicles each day to and from work. Furthermore, damages are impossible to calculate. How does one award damages for the risk that workers will be injured because they are riding on unsecured benches in a van that must suddenly screech to a halt? What is the appropriate amount of damages to award for the potential that a worker cannot recover any money for his injuries because a van has no insurance? Because the Secretary has no adequate remedy at law for the daily transportation of workers in unsafe and underinsured vans, she has shown irreparable harm.

29. The threatened injury to the Secretary outweighs any injury that Lykes Pasco will suffer from the injunction the Court outlines in the Conclusion to this Order. The Secretary is charged with enforcing the AWPA to protect migrant and seasonal workers. If the Court does not grant an injunction on Count (e), the Secretary has demonstrated that Lykes Pasco will not be accountable for its contractors continuing to drive workers in unsafe and uninsured vehicles. The risk to migrant workers of disabling injuries and even death will continue unabated without an injunction. On the other hand, Lykes Pasco will suffer minimal inconvenience. It could not take more than a few minutes for a company employee to copy the federal certificates of registration and return them to the contractors. Cesar Martinez testified that this procedure probably would cost less than $1,000.

30. Finally, it will not harm the public interest to grant an injunction. In contrast, it greatly serves the public interest to insure compliance with a law designed to protect those at the bottom economic rung of society from decades of exploitation.

## CONCLUSION

31. For the foregoing reasons, the Court finds that the Secretary is entitled to an injunction on Count (e). Lykes Pasco is ordered to immediately begin requiring those farm labor contractors who are transportation-authorized to post a copy of their valid certificates of registration in a conspicuous place in the front or rear windshield of all vehicles that the certificates authorize. Guards or other Lykes Pasco employees already posted at the entrances to the company's groves are ordered to check the certificates against the vehicles actually transporting the workers to ensure that contractors are transporting workers only in authorized vehicles.

32. The Court enters judgment in favor of Lykes Pasco on Counts (a) through (d). All other pending motions are denied as moot.